CUMIS INSURANCE SOCIETY,
INC., Plaintiff,

v.

CITIBANK, N.A., and CoreStates
Bank, N.A., Defendants.

No. 93 Civ. 8128 (JGK).

United States District Court,
S.D. New York.

March 31, 1996.

Allen G. Reiter, Siller, Wilk & Mencher L.L.P., New York City, for plaintiff.

J. Kelley Nevling, Jr., Citibank Legal Affairs Office, New York City, for defendant Citibank, N.A.

Andrew H. Bart, Pryor, Cashman, Sherman & Flynn, New York City, and Jonathan J. Bart, Patterson & Weir, Philadelphia, Pennsylvania, for defendant CoreStates Bank, N.A.

## OPINION AND ORDER

KOELTL, District Judge:

This action involves two wire transfers from the account of Mario Adler at Benchmark Federal Credit Union ("Benchmark") to the account of Covacentro, S.A. ("Covacentro"), at defendant Citibank, N.A. ("Citibank") which were allegedly sent by mistake by Benchmark and not returned by Citibank, and which plaintiff Cumis Insurance Society, Inc. ("Cumis"), subrogee of Benchmark, now seeks to recover by means of this lawsuit, having paid Benchmark for the loss pursuant to an insurance agreement. The second amended complaint pleads claims for fraud, negligent misrepresentation, conversion, and money had and received against Citibank.[1] Citibank moves to dismiss each of these claims pursuant to Fed.R.Civ.P. 12(b)(6), and, alternatively, under Fed.R.Civ.P. 9(b) with respect to the fraud claim. Cumis also sues CoreStates Bank, N.A. ("CoreStates") for alleged negligence in connection with its actions taken on behalf of Benchmark to recover the fraudulently transferred funds. CoreStates moves to dismiss that claim as barred by the statute of limitations and for failure to state a claim under Fed.R.Civ.P. 12(b)(6). Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

### I.

On a motion to dismiss, the factual allegations of the complaint are to be accepted as true and all reasonable inferences are construed in the plaintiff's favor. *See Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995); *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994). A court should dismiss a complaint under Fed.R.Civ.P. 12(b)(6) only "if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.'" *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir.1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). The second

amended complaint alleges the following version of events.

On November 5, 1991, a person identifying himself as "Mario Adler" called Benchmark's West Chester, Pennsylvania office and informed it that he would be sending an order for funds to be transferred from his account. This person proved later to be an impostor and he is herein after referred to as "Adler." The next day Benchmark received a faxed transfer order from "Adler" to the account of Covacentro, S.A. at Citibank in New York for $57,455. Benchmark made the transfer. On November 7, 1991, "Adler" informed Benchmark once again that he would like more money sent to the Covacentro account. The next day Benchmark received a faxed transfer order from "Adler" for $27,455 to the Covacentro account. Benchmark made this transfer as well.

On November 18, 1991, "Adler" called Benchmark to ask for the street address for its West Chester, Pennsylvania branch, explaining that he would be sending a large check for deposit. Three days later, Benchmark received a United States Treasury Department check for $442,136 made payable to "Adler Mario," endorsed "Mario Adler," and presented for deposit into Adler's account. Believing the check to have been tampered with, Benchmark alerted the Secret Service which subsequently determined that the check indeed was altered and that the endorsement of "Mario Adler" was a forgery.

On November 22, 1991, "Adler" called Benchmark to ask if the Treasury Department check had been received and if he could transfer $230,000 to the Covacentro account. The person taking the call told "Adler" that a bank supervisor would like to speak with him. "Adler" then hung up.

On December 6, 1991, the real Mario Adler attempted to withdraw funds from his Benchmark account and learned that a hold had been placed on it. After reviewing the transfer orders and the forged check, Adler executed affidavits of forgery. Benchmark then contacted Franklin McIntyre of Citibank to arrange for the return of the mistakenly

---

1. At oral argument, the plaintiff withdrew the claim for money had and received, and it is therefore not a subject of this Opinion.

transferred funds. McIntyre assured Benchmark that the Covacentro account had more than sufficient funds to cover the return of the transfers. McIntyre told Benchmark that "Citibank required an authenticated message or a tested telex requesting return of the Wire Transfers before they could be returned." (Compl. ¶ 15.) Jose Tavares, McIntyre's superior at Citibank, also confirmed that the Covacentro account had more than sufficient funds to cover return of the transfers and that "in order to recover them Benchmark would have to send Citibank an authenticated message or a tested telex requesting their return." (Compl. ¶ 16.) Citibank advised Benchmark that a hold would be placed on the Covacentro account pending receipt of the required documentation for return of the funds, and Citibank employee Charles Carmona withdrew the wire transfers from the Covacentro Account to put them on hold after obtaining oral permission to do so from Covacentro.

Later in the day, at approximately 4:40 p.m., Benchmark caused CoreStates to send Citibank a federal wire message requesting the return of the wire transfers. Benchmark explains that it did not have access to the necessary Fedwire telex system, and that CoreStates had such access and agreed to send the telex on Benchmark's behalf. That evening, Michael G. Louis, Esq., attorney for Benchmark, called McIntyre to confirm that Citibank had received the wire message. Louis spoke with Carmona who informed him that the message had not been received. Louis then called CoreStates to ask that a duplicate be sent, but CoreStates declined, arguing that sending a duplicate would cause confusion.

On December 9, 1991, Louis called Citibank again to confirm receipt of the wire message. Glendora Browne at Citibank informed him that the telex still had not been received. Louis then contacted William Reidy of Citibank's Fraud and Loss Prevention Department. Reidy reassured Louis that the Covacentro account had more than sufficient funds to cover the wire transfers.

On December 11, 1991, Roseann Murphy of CoreStates sent a second telex to Citibank requesting the return of the wire transfers.

The next day, Carmona at Citibank sent a telex to Murphy at CoreStates advising her that the December 11 telex was not tested and did not include an indemnification for Citibank. Tavares also contacted Murphy and stated, in the words that are at the heart of Cumis's fraud claim, that "Citibank could not return the Wire Transfers to CoreStates because they had been withdrawn by Covacentro and that it was futile for CoreStates to make any further attempts to retrieve them." (Compl. ¶ 25.) In the meantime, Carmona had returned the wire transfers to the Covacentro account without informing CoreStates that he had received authority from Covacentro to do so. (Compl. ¶ 22.)

Murphy relayed to Benchmark what she had been told by Citibank about the withdrawal of the funds by Covacentro and Tavares's statement that the funds could no longer be recovered. Cumis alleges that Citibank's statement caused CoreStates not to resend the telex requesting the return of the wire transfers as a tested telex with an indemnification and caused Benchmark to forego other means by which it could have secured the return of the funds. Citibank never did return the transferred funds to CoreStates or Benchmark. Although Citibank told CoreStates that the wire transfers had been withdrawn by Covacentro, the Covacentro account retained a balance of more than $84,910 at the time.

On February 5, 1992, Cumis paid Benchmark $85,380 under their insurance agreement, of which $84,910 covered the wire transfers and $470 represented a reimbursement of the cost of expert handwriting analysis to confirm that Adler had not signed the check or transfer orders.

In November 1993, Cumis brought this action against Citibank. An amended complaint was filed in May 1994, and a second amended complaint adding a negligence claim against CoreStates was filed in March 1995. The pleading now before the Court is the second amended complaint, which both Citibank and CoreStates move to dismiss on every claim.

## II.

Cumis bases its claim for fraud on the alleged statement by Tavares, the Citibank representative, that "it was futile for CoreStates to make any further attempts to retrieve the Wire Transfers because they had been withdrawn by Covacentro...." (Compl. ¶ 39.) Citibank argues that the fraud claim based on this representation fails as a matter of law for three reasons: first, the statement itself is not actionable; second, proximate cause is not pleaded; and third, Cumis has not pleaded intent with sufficient particularity. Cumis contests each of these arguments.

### A.

Citibank argues that the allegedly fraudulent statement in not actionable, supporting that argument by parsing the statement into two discrete representations. The first part of the statement, that the funds were not available, Citibank contends is true because the funds represented by the two wire transfers had indeed been withdrawn. Citibank submitted, under seal, bank records reflecting activity in the Covacentro account in support of this contention. (*See* Affidavit of J. Kelley Nevling, Esq., sworn May 2, 1995, Ex. E.) Of course, submission of evidence is not proper on a motion to dismiss because it is only the sufficiency of the pleadings that are at issue. Even if the motion were transformed into one for summary judgment, Cumis would be entitled to appropriate notice and an opportunity to offer evidence in response. In any event, whatever the actual activity in the account reveals, the Court must draw all reasonable inferences in favor of Cumis, and a plausible inference to draw from Tavares's alleged statement is that all of the funds were gone from the account and no balance remained— a statement of fact Cumis claims was untrue.

Citibank further argues that the second part of Tavares's statement about the futility of further attempts to retrieve the funds is not actionable because it merely reflected Citibank's future intentions. A false statement of present intent to perform a future act, however, can constitute actionable fraud under New York law. *See Cohen*

*v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.1994) (citing *Chase Manhattan Bank, N.A. v. Perla*, 65 A.D.2d 207, 210, 411 N.Y.S.2d 66, 68 (4th Dep't 1978)). Moreover, the two parts of Tavares's statement considered together support the inference that there was nothing Benchmark could do to recover the money— essentially, don't bother, the money's gone. This is the representation Cumis claims was fraudulent.

Even if Citibank were correct with respect to each of the two parts of Tavares's statement, which I do not believe it is, the statement as a whole may reasonably convey that the funds were no longer recoverable—a statement of fact that is actionable if untrue. On a motion to dismiss, ambiguities and inferences must be drawn in the plaintiff's favor. Therefore, Citibank's argument that the allegedly false representation cannot be the basis for a claim of fraud cannot prevail.

### B.

Citibank next argues that the complaint does not allege proximate cause with respect to the fraud claim. The complaint states that "CoreStates reasonably relied on Mr. Tavares's false statement and did not resend the December 11 Telex as a tested telex with proper indemnification to Citibank[,]" (Compl. ¶ 42), and that as a result "Benchmark suffered a loss of $84,910 in that Citibank subsequently allowed all of the funds from the Covacentro Account to be transferred out of the Covacentro Account after December 12, 1991 and Benchmark was unable to recover the Wire Transfers." (Compl. ¶ 43.) Citibank contends that these allegations do not establish that the loss of the funds was caused by Citibank's alleged misstatement. First, Citibank argues that Benchmark suffered its losses when it made the erroneous wire transfers in November 1991, a month before Citibank made any representations. Second, Citibank argues that the plaintiff's theory that without the alleged misrepresentation CoreStates would have sent a proper telex and that Citibank would then have returned the funds is too speculative and hypothetical.

To state a claim for fraud under New York law, a plaintiff must show that the defendant made a material false statement, with the intent to defraud the plaintiff, that the plaintiff reasonably relied on that statement, and that the statement thereby caused the plaintiff to suffer damages. *See Keywell Corp. v. Weinstein*, 33 F.3d 159, 163 (2d Cir.1994); *May Dep't Stores Co. v. International Leasing Corp., Inc.*, 1 F.3d 138, 141 (2d Cir.1993); *Albert Apartment Corp. v. Corbo Co.*, 182 A.D.2d 500, 500, 582 N.Y.S.2d 409, 410 (1st Dep't 1992), *lv. to appeal dismissed*, 80 N.Y.2d 924, 589 N.Y.S.2d 311, 602 N.E.2d 1127 (1992) (table). The fraud and the injury must have a cause-and-effect relationship. *See Megaris Furs, Inc. v. Gimbel Bros., Inc.*, 172 A.D.2d 209, 212–13, 568 N.Y.S.2d 581, 584–85 (1st Dep't 1991); *see also* NY PJI 3:20 cmt. ("Reliance is to fraud what proximate cause is to negligence. . . .").

Citibank is correct that Cumis cannot claim that Citibank's alleged misrepresentation on December 12 "caused" Benchmark to send the wire transfers on November 6 and 8. But that is not Cumis's claim. Cumis alleges that it acted, or more accurately elected not to act, in reliance on the December 12 statement when, through CoreStates, it did not send a tested telex with an indemnification.[2]

The thrust of Citibank's argument is that it had no obligation to return the wire transfer funds to Benchmark. Even if Benchmark sent a tested telex with an indemnification, Citibank argues that it still had every right to refuse to return the funds to Benchmark. In any event, because the decision whether to return the funds was wholly within its discretion, Citibank's statements could not have caused any damage to Benchmark. Any loss to Benchmark was caused by Citibank's decision not to return the funds to Benchmark, a decision it had every right to make. Therefore, the allegedly false statement to Benchmark did not cause Benchmark's alleged loss. Based on the facts pleaded in the complaint, Citibank is correct that Cumis has not pleaded that its alleged loss—failing to secure the return of the wire transfers from Citibank—was caused by Citibank's allegedly false statement.

Under Article 4–A of the U.C.C., Citibank, as the receiving bank, "accepted" the wire transfers when they were credited to Covacentro's account. *See* U.C.C. § 4–A–209. Cumis does not allege otherwise. Once accepted, Citibank became obligated to pay those funds to the beneficiary, Covacentro. *See* U.C.C. § 4–A–404. Citibank could, however, agree to return the funds under U.C.C. § 4–A–211,[3] but the decision to do so was in Citibank's sole discretion. As the official commentary to the U.C.C. explains, "[i]f the receiving bank has incurred liability as a result of its acceptance of the sender's order, there are substantial risks in agreeing to cancellation or amendment." U.C.C. § 4–A–211 cmt. 5. In this case, Citibank offered to return the funds conditioned on receipt of a tested telex with an indemnification.[4] The

---

2. Although unclear from the pleadings, Cumis apparently alleges that CoreStates was acting as its agent in connection with the wire transfer at issue in this case. Citibank does not dispute the legal sufficiency of this aspect of the complaint.

3. U.C.C. § 4–A–211(3) provides that "after a payment order has been accepted, cancellation or amendment of the order is not effective unless the receiving bank agrees." The Official Comment to § 4–A–211 states that, "a receiving bank may agree to cancellation . . . of the payment order under subdivision (c) [subdivision (3) in the New York version of the U.C.C.] but is not required to do so regardless of the circumstances."

U.C.C. § 4–A–502(3)(b) provides that:
If a beneficiary bank has received a payment order for payment to the beneficiary's account in the bank, the following rules apply . . .

(b) The bank may credit the beneficiary's account and allow withdrawal of the amount credited unless creditor process with respect to the account is served at a time and in a manner affording the bank a reasonable opportunity to act to prevent withdrawal.
"Creditor process" is defined in U.C.C. § 4–A–502(1) as "levy, attachment, garnishment, notice of lien, sequestration, or similar process issued by or on behalf of a creditor or other claimant with respect to an account."

4. Cumis suggests that this indemnification duplicates unnecessarily the indemnification provided by U.C.C. § 4–A–211(6). This may not be the case. Under U.C.C. § 4–A–103(1)(e), a "sender" is defined as the person "giving the instruction to the receiving bank." In this case, Citibank may have desired a contractual indemnity beyond that provided under § 4–A–211(6) in order to eliminate any potential confusion as to whether the

complaint alleges that McIntyre instructed Benchmark that "Citibank required an authenticated message or a tested telex requesting return of the Wire Transfers before they could be returned," (Compl. ¶ 15), and that Tavares subsequently stated that "in order to recover them Benchmark would have to send Citibank an authenticated message or a tested telex requesting their return." (Compl. ¶ 16.)

 There is no allegation that a suitable telex had been sent at the time of Tavares's alleged statement about the futility of any further efforts to retrieve the wire transfers. Therefore, Citibank's offer remained just that—an offer as yet unaccepted. Tavares's statement, whether true or not, plainly revoked that offer. Under well-established New York law, unless supported by consideration, an offer is freely revocable by the offeror. *See Evans v. 2168 Broadway Corp.*, 281 N.Y. 34, 40, 22 N.E.2d 152, 154 (1939); *Buchbinder Tunick & Co. v. Manhattan Nat'l Life Ins. Co.*, — A.D.2d —, —, 631 N.Y.S.2d 148, 150 (1st Dep't 1995). A revocation is a clear manifestation of an intent not to perform, and once communicated to the offeree, terminates the offeree's power to accept the offer. *See* Restatement (Second) of Contracts § 42. Tavares's statement that any further telexes would be futile is a clear manifestation of Citibank's unwillingness to cancel the accepted wire transfers. In addition, Citibank returned the funds from the segregated account to Covacentro's general account, conduct at odds with an intention to return the funds. *See* Restatement (Second) of Contracts § 43 ("An offeree's power of acceptance is terminated when the offeror takes definite action inconsistent with an intention to enter into the proposed contract and the offeree acquires reliable information to that effect.") Hence, Citibank made it clear that it had decided it was no longer willing to return the funds to Benchmark—a decision Citibank had every right to make. No offer to return the funds was open for Benchmark or CoreStates to accept by sending a suitable telex. Citibank had

already explained, as it had every right to do, that any further telex would be futile. Under U.C.C. § 4–A–211(a), nothing Benchmark or CoreStates could have done would have obligated Citibank to transfer the funds back. Thus, Benchmark could not have been harmed by allegedly relying on Citibank's statement and failing to send a tested telex with an indemnification. Because this is the only action Cumis alleges was taken in reliance on Citibank's statement, Cumis's claim for fraud must be dismissed.

### C.

 In the alternative, Citibank's argument that Cumis fails to allege fraud with sufficient particularity is an independent grounds for dismissing the complaint. Federal Rule of Civil Procedure 9(b) provides that:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

Under the rule, a complaint alleging fraud must contain a "factual basis which gives rise to a 'strong inference' of fraudulent intent" by the defendant. *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991), quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). As the Court of Appeals of the Second Circuit has explained:

> A common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so. *Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.*

*Beck v. Manufacturer's Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987) (emphasis add-

---

statutory indemnity covered Benchmark, CoreStates, or both. In any event, the issue is immaterial since Cumis does not allege that Citibank did not have the right to demand a tested telex with

an indemnification, or that such conditioning an offer to return the funds on such a telex was in any way improper or unlawful.

ed) (citations omitted), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989) (in banc). *See Ochs v. Shearson Lehman Hutton Inc.,* 768 F.Supp. 418, 427 (S.D.N.Y. 1991); *Finkel v. The Stratton Corp.,* 754 F.Supp. 318, 328–29 (S.D.N.Y.1990), *aff'd in part, rev'd in part,* 962 F.2d 169 (2d Cir. 1992). The requirements under Rule 9(b) for pleading scienter are distinct from the necessity of pleading with particularity the circumstances of the fraud, including the time, place, speaker, and fraudulent nature of the alleged misrepresentations. *See Cohen v. Koenig,* 25 F.3d 1168, 1173–74 (2d Cir.1994); *Cosmas v. Hassett,* 886 F.2d 8, 11–13 (2d Cir.1989); *Ochs,* 768 F.Supp. at 427 ("A complaint may adequately identify the statements alleged to be misrepresentations and properly indicate when, where and by whom they were made, yet still fail Rule 9(b) scrutiny if the complaint does not allege circumstances giving rise to a strong inference that defendant knew the statements to be false and intended to defraud plaintiff." (citations omitted)). Citibank argues that the complaint reflects a pattern of responsible efforts to assist Benchmark rather than an intent to defraud it and that it does not allege that Citibank had any motive to lie to Benchmark.

It is true, as Cumis argues, that the complaint sets forth the alleged fraudulent statement, who made it to whom, at what time, and the manner in which the statement was allegedly fraudulent. This level of specificity is more than adequate under Rule 9(b) with respect to the circumstances of the alleged fraud. Nonetheless, Cumis has not pleaded facts from which a strong inference of fraudulent intent may be drawn. The complaint does not allege facts supporting motive and opportunity to defraud, particularly in view of Citibank's original offer to return the funds. Cumis does not rely on that basis to satisfy the scienter pleading requirement, however. Instead, Cumis argues that the actual status of the funds was different from the situation Tavares represented on December 12, and that this allegation alone satisfies Rule 9(b) by alleging knowledge generally. Citibank correctly disputes, however, whether the facts alleged show conscious behavior

by Tavares from which a strong inference of fraudulent intent may be drawn, especially given the absence of any pleaded facts showing a motive to mislead Benchmark.

As Citibank argues, Tavares's statement is entirely consistent with a belief on his part that the specific wire transfers in question were gone while other funds remained in the account. While Cumis quarrels with that interpretation, the facts pleaded do not show that Tavares was attempting to mislead Benchmark by making a statement he knew was false. Moreover, the facts pleaded do not show that the gravamen of Tavares's statement about the futility of sending another telex was inaccurate, particularly in view of Citibank's unfettered right to refuse to return the wire transfers.

Even after conducting discovery on Citibank and deposing Tavares, Cumis remains unable to allege facts giving rise to a strong inference of fraudulent intent. Accordingly, Cumis's second claim is also dismissed for failure to plead fraud with particularity pursuant to Rule 9(b).

### III.

■ Cumis claim for negligent misrepresentation is based on the same alleged statements by Tavares with respect to the status of the funds and the futility of Benchmark's sending another telex. Citibank argues that the failure to plead reliance is equally fatal to the negligent misrepresentation claim, and alternatively that the complaint does not plead a sufficiently close relationship between Benchmark and Citibank to state a claim for negligent misrepresentation under New York law.

Cumis's allegations with respect to its claim for negligent misrepresentation are somewhat broader than those constituting its fraud claim. In addition to electing not to send another telex, Cumis alleges that "but for Citibank's statement to Ms. Murphy, Benchmark would have pursued other means that would have secured the return of the Wire Transfers." (Compl. ¶ 35.) Cumis does not explain what other means Benchmark could have pursued, nor does Cumis allege that Citibank was aware that such

additional steps were being considered based on the information being related to CoreStates regarding the Covocentro account. In spite of these additional allegations, Cumis has filed to state of claim for negligent misrepresentation.

New York courts have "long held that before a party may recover in tort for pecuniary loss sustained as a result of another's negligent misrepresentations there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity." *Prudential Ins. Co. of America v. Dewey, Ballantine, Bushby, Palmer & Wood,* 80 N.Y.2d 377, 382, 590 N.Y.S.2d 831, 833, 605 N.E.2d 318, 320 (1992). Whether the relationship between two parties is sufficiently close depends on a three-pronged test. As explained recently by the Court of Appeals for the Second Circuit, to establish a sufficiently close relationship a plaintiff must show:

> (1) awareness that the reports were to be used for a particular purpose or purposes; (2) reliance by a known party or parties in furtherance of that purpose; and (3) some conduct by the defendants linking them to the party or parties and evincing defendant's understanding of their reliance.

*Dorking Genetics v. United States,* 76 F.3d 1261, 1269 (2d Cir.1996) (quoting *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson,* 73 N.Y.2d 417, 418, 424, 541 N.Y.S.2d 335, 335, 338, 539 N.E.2d 91, 91, 94 (1989)). *See Sazerac v. Falk,* 861 F.Supp. 253, 259 (S.D.N.Y.1994) (quoting *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 443, 483 N.E.2d 110, 118 (1985)); *Prudential,* 80 N.Y.2d at 384, 590 N.Y.S.2d at 834–35, 605 N.E.2d at 321–22; *Security Pacific Business Credit, Inc. v. Peat Marwick Main & Co.,* 79 N.Y.2d 695, 702–03, 586 N.Y.S.2d 87, 90–91, 597 N.E.2d 1080, 1083–84 (1992).

Cumis's claim for negligent misrepresentation fails this three-prong test. With respect to the allegation that Benchmark would have sent another telex, that aspect of the claim fails the second prong of the test for the same reasons that the allegations do not establish reasonable reliance for the fraud claim. On the other hand, the allegation that Benchmark refrained from taking unspecified other steps to secure the return of the funds fails to state a claim for negligent misrepresentation because there are no allegations that Citibank was aware that Benchmark was inquiring about the status of the Covacentro account for that purpose. Nor are there any allegations that Citibank took any action indicating that it knew Benchmark was relying on its representations for such a purpose. Therefore, this aspect of the negligent misrepresentation claim fails both the first and third prongs of the three-prong test.

The failure to satisfy the test reflects the lack of a sufficiently close relationship between Benchmark and Citibank. In this case, the complaint lacks any allegation that the relationship between Benchmark and Citibank was anything more than arms-length, based solely upon the happenstance of "Adler's" apparent fraud. There is no allegation of a direct contractual relationship or even a putative contract that would give rise to an inference that the parties were in a close relationship approaching privity. Indeed, the allegations reveal a single incident consisting of a handful of brief telephone calls, unsolicited by Citibank, and mostly initiated by Benchmark, or CoreStates acting on Benchmark's behalf. The episode culminated in an aborted attempt to arrange for the return of the funds on terms demanded by Citibank.

Even if true, these allegations fail to establish a relationship sufficiently approaching privity, particularly when compared to closer relationships which have been held insufficient to state a claim for negligent misrepresentation. *See Durante Bros. and Sons, Inc. v. Flushing Nat'l Bank,* 755 F.2d 239, 252 (2d Cir.) ("An ordinary creditor-debtor relationship between bank and customer does not create such a duty of care."), *cert. denied,* 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985); *Estate of T.C. Sabarese v. First Nat'l Inv. Corp.,* No. 92 Civ. 8139, 1994 WL 573320, at *4 (S.D.N.Y.1994) ("In the absence of contractual privity, a prior or continuing association between the parties is also generally thought necessary."); *Banque Arabe et*

*Internationale D'Investissement v. Maryland Nat'l Bank,* 819 F.Supp. 1282, 1293 (S.D.N.Y.1993) ("Neither an ordinary contractual relationship nor a banking relationship, without more, is sufficient to establish a 'special relationship,' which only occurs in the context of a previous or continuing relationship between two parties."), *aff'd,* 57 F.3d 146 (2d Cir.1995); *Besicorp Group, Inc. v. Crown Life Ins. Co.,* No. 88–CV–114, 1992 WL 350603, at *6 (N.D.N.Y. Nov. 23, 1992) (securities underwriter and guarantor); *Banque Nationale de Paris v. 1567 Broadway Ownership Assocs.,* 214 A.D.2d 359, 360, 625 N.Y.S.2d 152, 154 (1st Dep't 1995) ("There is no fiduciary duty or privity of contract arising out of the contractual arms-length debtor and creditor legal relationship between a borrower and a bank which would give rise to a cause of action for negligent misrepresentation."); *United Safety of America, Inc. v. Consolidated Edison Co. of New York, Inc.,* 213 A.D.2d 283, 286, 623 N.Y.S.2d 591, 593 (1st Dep't 1995).[5]

Because the allegations in the complaint do not satisfy the elements required to plead a sufficiently close relationship between Benchmark and Citibank, Cumis fails to state a claim for negligent misrepresentation under New York law. Accordingly, the claim for negligent misrepresentation is dismissed.

## IV.

■ The third claim against Citibank is for conversion. Citibank argues that this claim fails as a matter of law because, first, the property allegedly converted is not dis-

crete or identifiable, and, second, Citibank's possession and disposition of the funds was not wrongful or unlawful. Cumis responds by arguing that the funds were segregated and identifiable and that this question raises an issue of fact that precludes dismissal on this motion. Cumis also argues that the conversion occurred when Citibank removed the funds from the segregated account and made them available to Covacentro, all while knowing that Benchmark had transferred the funds mistakenly and was attempting to retrieve them. Citibank replies that its act of making the funds available to its customer cannot be unlawful or wrongful because it was authorized expressly under the U.C.C. Citibank also argues that the tort of conversion is preempted by the provisions of the U.C.C. governing cancellation of wire transfers.

■ Under New York law,[6] conversion is any act of dominion wrongfully exerted over another person's personal property inconsistent with that person's rights in the property. *See G.D. Searle & Co. v. Medicore Communications, Inc.,* 843 F.Supp. 895, 912 (S.D.N.Y.1994); *Peters Griffin Woodward, Inc. v. WCSC, Inc.,* 88 A.D.2d 883, 883, 452 N.Y.S.2d 599, 600 (1st Dep't 1982). A claim for conversion of money must allege that "there is an obligation to return ... the specific money in question, and such money can be described or identified in the same manner as a specific chattel." *G.D. Searle,* 843 F.Supp. at 912; *see Kubin v. Miller,* 801 F.Supp. 1101, 1118 (S.D.N.Y.1992); *Manufacturers Hanover Trust Co. v. Chemical*

---

**5.** Cumis's reliance on *Sheridan v. United States,* 542 F.Supp. 1243 (E.D.N.Y.1982) and *International Products* does not undermine the well-established New York law. In *Sheridan* the court barred the plaintiffs' Federal Tort Claims Act claim against the federal government because the plaintiffs had attempted to assert it as a negligent misrepresentation claim, a cause of action specifically barred under the statute. But rather than applying New York law, the court looked instead to "generally accepted principles relating to negligent misrepresentation in order to determine the applicability of the exclusion provision to the instant claims." *Sheridan,* 542 F.Supp. at 1246 (citing Restatement (Second) Torts § 552(3), public duty liability). Thus, *Sheridan* does not support Cumis's position with respect to the law governing this action. Nor does the dicta about

"morals and good conscience" in *International Paper* support the plaintiff's position because that case does not clarify, as later cases have, the kinds of business dealings that engender a special relationship within the meaning of the New York common law of negligent misrepresentation.

**6.** The parties agree that New York law governs the dispute between Cumis and the New York receiving bank, Citibank, as provided by U.C.C. § 4–A–507(1)(a). That provision has been adopted both by Pennsylvania, *see* 13 Pa.Cons Stat. § 4A507, and New York, *see* N.Y.U.C.C. § 4–A–507. *See also* Federal Reserve Board Regulation J, 55 Fed.Reg. 40,801 (1990) (as amended Oct. 5, 1990) (codified at 12 C.F.R. Part 210 (Subpart B and Appendix B)).

*Bank,* 160 A.D.2d 113, 124, 559 N.Y.S.2d 704, 712 (1st Dep't 1990); *Payne v. White,* 101 A.D.2d 975, 976, 477 N.Y.S.2d 456, 458 (3d Dep't 1984); *Meese v. Miller,* 79 A.D.2d 237, 242, 436 N.Y.S.2d 496, 500 (4th Dep't 1981).

Cumis alleges that Citibank itself segregated the disputed funds after being informed that Benchmark had sent them by mistake and wished to cancel the transfer. (*See* Compl. ¶ 16.) Therefore, while funds commingled in an account are ordinarily not specifically identifiable for the purposes of a conversion claim, *see, e.g., Geler v. National Westminster Bank USA,* 770 F.Supp. 210, 215 (S.D.N.Y.1991); *Massive Paper Mills v. Two–Ten Corp.,* 669 F.Supp. 94, 95–96 (S.D.N.Y.1987); *Peters Griffin,* 88 A.D.2d at 883, 452 N.Y.S.2d at 600, there is a factual dispute in this case with respect to whether the funds were segregated in a manner that permitted them to be specifically identifiable. *See Swan Brewery Co. Ltd. v. United States Trust Co. of New York,* 832 F.Supp. 714, 718–20 (S.D.N.Y.1993) (describing difference between general and special accounts, an inquiry depending largely on "the mutual intent of the parties"). Cumis alleges that they were and that they were segregated by Citibank itself. On a motion to dismiss, the plaintiff's allegations are presumed true, and therefore, dismissal of the conversion claim on this basis is not warranted.

Nevertheless, Cumis's conversion claim does not state a claim under New York law because there is no allegation of any wrongful or improper act of dominion by Citibank in contravention of Cumis's or Benchmark's rights. The alleged acts constituting a conversion are specifically permitted under U.C.C. Article 4–A. There is no dispute that once the funds were credited to Covacentro's account they were accepted within the meaning of U.C.C. § 4–A–209. As explained above, Citibank was under no obligation to agree to return the funds once accepted pursuant to § 4–A–211(3). Cumis does not allege that there was any agreement to return the funds—only that Citibank had offered to do so upon receipt of suitable telex. Before any such telex was received, Citibank permitted the funds to be withdrawn, action specifically authorized by § 4–A–502(3)(b), which provides that "[t]he bank may credit the beneficiary's account and allow withdrawal of the amount credited unless creditor process with respect to the account is served at a time and in a manner affording the bank a reasonable opportunity to act to prevent withdrawal." There is no allegation that Citibank was served with any creditor process, and therefore Citibank was entitled to make the funds available to Covacentro. Accordingly, Cumis does not state a claim because all of the acts alleged to constitute a conversion were specifically authorized under applicable provisions of the U.C.C. and were not wrongful, improper, or in contravention of Benchmark's rights. Therefore, Citibank's motion to dismiss the conversion claim is granted.[7]

## V.

CoreStates moves to dismiss Cumis's negligence claim as time-barred under

---

7. In its reply papers, Citibank argues that U.C.C. Art. 4–A preempts any cause of action for conversion in connection with wire transfers where remedies are explicitly provided in the statute. This proposition does have support in the official commentary to the statute itself, *see* U.C.C. § 4–A–102 cmt. ("The rules ... are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A[4–A] is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article."), the decisions of New York courts, *see, e.g., Aleo Int'l, Ltd. v. Citibank, N.A.,* 160 Misc.2d 950, 952, 612 N.Y.S.2d 540, 541 (Sup.Ct.N.Y.Co.1994) (granting summary judgment dismissing negligence action where return of accepted transfer found governed exclusively by U.C.C. § 4–A–211(2)), and decisions by this Court applying the New York U.C.C. *See Centre–Point Merchant Bank Ltd. v. American Express Bank Ltd.,* 913 F.Supp. 202, 208 (S.D.N.Y.1996) (McKenna, J.) (dismissing claims covered by specific provisions of Art. 4–A); *Sheerbonnet, Ltd. v. American Express Bank, Ltd.,* 905 F.Supp. 127, 130–37 (S.D.N.Y. 1995) (Preska, J.) (discussing in detail exclusivity of Art. 4–A). *See also Donmar Enters. v. Southern Nat'l Bank,* 64 F.3d 944, 950 (4th Cir.1995) (holding that U.C.C. Art. 4–A adopted by Federal Reserve Board Regulation J, Subpart B preempts state law causes of action for negligence on facts of the case). Because this argument was raised for the first time in Citibank's reply brief, however, it is not a proper basis for granting the motion to dismiss.

the statute of limitations. Cumis alleges that CoreStates was negligent in not sending a tested telex to Citibank in the period December 6–12, 1991. (Compl. ¶¶ 54–60.) CoreStates argues that Benchmark, and therefore Cumis, knew of its injury at that time and had two years during which it could assert a negligence claim against CoreStates. CoreStates contends that Cumis's negligence action, asserted for the first time in the second amended complaint filed in March 1995, is therefore time-barred.

Pennsylvania law provides a two year statute of limitations for negligence.[8] 42 Pa. Cons.Stat. § 5524(7). CoreStates was joined as a defendant in this action on March 31, 1995. The question is whether the cause of action for negligence accrued before or after March 31, 1993, two years earlier. On this the parties agree. The parties disagree, however, on when the cause of action accrued. Cumis alleges that it "did not learn about [the] shortcomings of the December 11 Telex until the course of discovery in this action." (Compl ¶ 21.) CoreStates argues that the bare allegation that the plaintiff did not actually discover the defendant's alleged negligence does not avoid the limitations bar if, in the exercise of reasonable diligence, the plaintiff should have learned of the facts and circumstances of its claim more than two years before bringing the suit. Cumis responds by arguing that it may have known of its injury earlier—in fact Cumis paid Benchmark's insurance claim in February 1992— but CoreStates's role in that injury was not discovered until Citibank produced the actual telex during discovery after March 31, 1993.

██ Under Pennsylvania law, "[a] cause of action for negligence arises on the date of the alleged act or omission or on the date plaintiff discovers, or reasonably should have discovered, the harm he has suffered if it is not immediately apparent." *Manning v. Maloney*, 787 F.Supp. 433, 437 (M.D.Pa.1992) (quoting *School Dist. of the Borough of Aliquippa v. Maryland Cas. Co.*, 402 Pa.Super. 569, 578–82, 587 A.2d 765, 770–71 (1991)),

*aff'd*, 980 F.2d 722 (3d Cir.1992) (table). As the Pennsylvania Supreme Court has explained:

The "discovery rule" ... arises from the inability of the injured, despite the exercise of due diligence, to know of the injury or its cause.... The salient point giving rise to the equitable application of the exception of the discovery rule is the inability, despite the exercise of diligence by the plaintiff, to know of the injury. A court presented with an assertion of applicability of the "discovery rule" must, before applying the exception of the rule, address the ability of the damaged party, exercising reasonable diligence, to ascertain the fact of a cause of action.

*Pocono Int'l Raceway, Inc. v. Pocono Produce Inc.*, 503 Pa. 80, 85, 468 A.2d 468, 471 (1983); *see also Vernau v. Vic's Market, Inc.*, 896 F.2d 43, 46 (3d Cir.1990) ("Under Pennsylvania tolling principles, the statute is tolled until 'plaintiffs knew or using reasonable diligence should have known of the claim.'") (quoting *Urland v. Merrell–Dow Pharmaceuticals, Inc.*, 822 F.2d 1268, 1272 (3d Cir.1987)). It is the plaintiff's burden to plead facts sufficient to toll the statute of limitations by means of the discovery rule. *See Resolution Trust Corp. v. Farmer*, 865 F.Supp. 1143, 1148 (E.D.Pa.1994). Furthermore, "[t]he Third Circuit has ruled that when a motion to dismiss is advanced on the ground that it is barred by the statute of limitations, '[t]he question to be answered thus becomes whether the assertions of the complaint, given the required broad sweep, would permit adduction of proofs that would provide a recognized legal basis for avoiding the statutory bar.'" *Atlantic Paper Box Co. v. Whitman's Chocolates*, 844 F.Supp. 1038, 1044 (E.D.Pa.1994) (quoting *Leone v. Aetna Cas. & Sur. Co.*, 599 F.2d 566, 567 (3d Cir. 1979)). *See Sanders v. Department of the Army*, 981 F.2d 990, 991 (8th Cir.1992) ("Although statutes of limitations provide an affirmative defense that ordinarily must be specifically pleaded, *see* Fed.R.Civ.P. 8(c), a complaint is subject to dismissal for failure to

**8.** The parties agree that Pennsylvania law governs this claim because all of the actions relating to Benchmark's request that CoreStates send a telex to Citibank took place in Pennsylvania between a Pennsylvania bank on the one hand, Benchmark, and a national bank headquartered in Pennsylvania on the other, CoreStates.

state a claim 'when the affirmative [limitations] defense clearly appears on the face of the complaint.' " (quoting *White v. Padgett*, 475 F.2d 79, 82 (5th Cir.), *cert. denied*, 414 U.S. 861, 94 S.Ct. 78, 38 L.Ed.2d 112 (1973)) (alteration in original)). Therefore, the issue in this case is whether the allegations in the complaint establish that the plaintiff should have learned, in the exercise of reasonable diligence, the factual circumstances of its claim prior to March 31, 1993.

"There are very few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful." *Vernau*, 896 F.2d at 46 (quoting *Urland*, 822 F.2d at 1273). Without doubt, Benchmark had every reason to investigate why the arrangement it made with Citibank for return of the funds had miscarried. Assuming the allegations in the complaint are true, Benchmark believed the state of affairs were as follows. Benchmark had been informed by Citibank that the funds were recoverable and a tested telex with an indemnification was required before the funds would be returned. (Compl. ¶¶ 15–16.) Benchmark had asked CoreStates to send such a telex, and CoreStates had agreed. Benchmark then had learned that Citibank had not received the first telex. Benchmark had asked CoreStates to resend it, but CoreStates refused. Benchmark had called Citibank again on December 9 and had been informed that Citibank had still not received any telex. Benchmark also had been reassured that the funds were available. According to the complaint, the next thing Benchmark learned through CoreStates was that the funds were no longer available and any further telexes would be "futile." This is what Benchmark knew according to the pleadings as of December 12, 1991.

Benchmark knew of its injury in December 1991 when Tavares allegedly stated that further telexes would be futile, and Benchmark became aware at that time that Citibank had refused to return the wire transfers. It is of no significance that Benchmark may not have known the details of CoreStates's alleged failure to send a proper telex. Benchmark was aware of its injury and was under a duty under Pennsylvania law to make a diligent inquiry to determine the details of any cause of action it may have had. It is unimportant that the complaint alleges that Benchmark was actually unaware of CoreStates's actions and allegedly remained so until 1995. *See Pocono Int'l Raceway*, 503 Pa. at 85, 468 A.2d at 472 (discovery rule does not depend on "retrospective view of whether the facts were actually ascertained within the period"). The situation that Benchmark faced presented sufficient facts to "awaken inquiry" and raise a duty for Benchmark to investigate. Yet, there are no allegations to support even an inference that upon conducting such an investigation, Benchmark could not have discovered all of the details of CoreStates's actions taken on its behalf.

The plaintiff's failure to exercise due diligence is exacerbated by the fact that Cumis is a subrogee by virtue of having paid Benchmark's insurance claim. When Cumis settled the claim in February 1992 it had its own opportunity to conduct an independent investigation into the facts and circumstances surrounding the claim or to collect documentation from Benchmark. In its papers submitted in opposition to this motion, the plaintiff explains that "[o]nly after receiving the December 11 telex from Citibank during discovery, because, for some reason, CoreStates has no copy of it, did Cumis discover that CoreStates's actions caused its loss." (Pl.'s Mem. Opp'n at 11.) Even if Benchmark and Cumis *never* had a copy of the December 11 telex, the fact that Citibank did eventually produce it in litigation illustrates how little effort was required to obtain information about the facts and circumstances of the plaintiff's negligence claim against CoreStates. In any event, the plaintiff's proffered explanation does not excuse its failure to exercise reasonable diligence at any time from December 12, 1991 to March 31, 1993.

Accordingly, based on the plaintiff's own allegations in the complaint, I find that Benchmark, and therefore its subrogee Cumis, was aware of its injury in December 1991 and was under a duty to exercise reasonable diligence to discover the facts and circumstances forming the basis for a negligence claim against CoreStates. Because its claim was brought after March 31, 1993,

more than two years after discovery of the injury, and because it is clear from the pleadings that the plaintiff cannot avoid the Pennsylvania two-year statute of limitations, the claim is time barred. CoreStates's motion to dismiss the negligence claim is therefore granted.

## CONCLUSION

In accordance with the foregoing, CoreStates's motion to dismiss is **granted.** Citibank's motion to dismiss is **granted** without prejudice to plaintiff's filing an amended complaint within thirty (30) days of the date of this Opinion with respect to the claim for fraud. Cumis's remaining claims against Citibank are dismissed with prejudice:

**SO ORDERED.**