MANUFACTURERS HANOVER TRUST COMPANY, Respondent, v
CHEMICAL BANK, Appellant.

First Department, August 2, 1990

## APPEARANCES OF COUNSEL

*Kenneth J. Kelly* of counsel *(Lisa D. Fishman* with him on the brief; *Epstein Becker & Green, P. C.,* attorneys), for appellant.

*Manuel W. Gottlieb* of counsel *(Robert M. Rosenblith,* attorney), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

Suing on, *inter alia,* a mistaken payment/money had and received cause of action, Manufacturers Hanover Trust Company (MHT) seeks to recover from Chemical Bank the first of two redundant electronic wire transfer payments in the amount of $223,280.74 made by it on September 9, 1983 to Chemical.

The following account, which is gleaned basically from the parties' stipulation of facts, is undisputed. On or about September 7, 1983, MHT received wire transfer instructions from one of its Saudi Arabian correspondent banks to transfer $223,280.74 to Chemical for credit to the nine-digit Chemical account of Merrill Lynch (No. 066119146), in favor of Ali Hazza's eight-digit Merrill Lynch account (No. 17708022).

On September 9, 1983, MHT sent a transfer message via

CHIPS, an acronym for Clearing House Interbank Payments System, to Chemical which omitted key information, specifically, the nine-digit Chemical account number to be credited, and the name of the intended recipient, Merrill Lynch, the owner of that account. MHT's message provided only the name and eight-digit Merrill Lynch account number of Ali Hazza, the ultimate beneficiary. Chemical nevertheless credited MHT's funds to Ali Hazza's nine-digit Chemical account, the number of which was not contained in any instruction sent either by MHT's Saudi correspondent bank to MHT, or by MHT to Chemical. Ali Hazza's Chemical account had a negative balance of −$1,871,425.96 at the end of the prior day, September 8, 1983, and of −$1,404,010.80 at the end of the day of the transfer, September 9, 1983. When MHT realized, later that day, that a line had been omitted from the transmission, a second transfer order was executed, this time correctly, pursuant to which $223,280.74 was credited correctly by Chemical to Merrill Lynch's Chemical account for further credit to Ali Hazza's Merrill Lynch account.

About seven weeks later, on November 22, 1983, MHT received notice from the originating Saudi Arabian bank that it had been debited by MHT for two transfers instead of one. Having no knowledge that Ali Hazza maintained an account with Chemical, or that Chemical had credited MHT's funds to an account for which no one had intended them, MHT concluded that there had been an inadvertent duplication, and assumed that Chemical had credited both transfers to Merrill Lynch's Chemical account. Accordingly, on November 28, 1983, MHT, identifying both, requested Chemical to return the second of the two transfers in return for MHT's indemnity against any claims made against Chemical. Chemical, on November 30, 1983, refused MHT's request on the ground that it was seeking debit authority from Merrill Lynch. The negative balances in Ali Hazza's Chemical account on November 28, and 30, 1983, the dates of MHT's request for the return of its funds and of Chemical's rejection of MHT's offer of indemnity, were −$2,534,009 and −$2,598,812.92, respectively. Merrill Lynch refused debit authority to Chemical on December 29, 1983 because the funds it had received "were due to Merrill Lynch". Chemical communicated Merrill Lynch's refusal to MHT on January 3, 1984.

Although Chemical immediately notified Merrill Lynch that the first transfer had gone directly to Ali Hazza, the ultimate beneficiary, at no time did Chemical inform MHT that it had

credited the first transfer to an Ali Hazza account at Chemical, not to Merrill Lynch's Chemical account. Instead, Chemical indicated to MHT that, since Merrill Lynch had refused debit authority, MHT would have to seek return of its funds from Ali Hazza. As a consequence, MHT had to approach Ali Hazza through its Bahrain branch. Approximately 11 months later, on October 18, 1984, Ali Hazza wired debit authority to Chemical in favor of MHT. Chemical, however, refused to honor Ali Hazza's debit authority, or to return MHT's funds. At the time, the negative balance in Ali Hazza's Chemical account was −$1,373,100.06. It should be noted that on the date Chemical received Ali Hazza's debit authority, Ali Hazza's overdraft was substantially lower than on the date Chemical had credited MHT's funds to Ali Hazza's account.

The final negative balance of Ali Hazza's account totaled $1,186,765.40 (approximately $900,000 in principal and $300,000 in interest), which was written off by Chemical. Had it not credited to that account the first of MHT's September 9, 1983 wire transfer payments, Chemical would have had to write off approximately $225,000 more, plus interest. On October 4, 1984, MHT recredited the originating Saudi bank with the amount of the erroneous first transfer to Chemical.

After Chemical refused MHT's demand that it debit Ali Hazza's account and repay the erroneous transfer, MHT brought this action. Although its complaint asserted three causes of action—mistaken payment/money had and received, money lent, and conversion—MHT moved for summary judgment only on its mistaken payment/money had and received claim. Chemical cross-moved for summary judgment dismissing the complaint in its entirety, arguing that during the year from September 1983 to September 1984, while MHT was either pressing for the return of the correct transfer or, as it argues, doing nothing, Ali Hazza went from an active firm, able to cover hundreds of thousands of dollars in debits each week, to a dormant bankrupt, without business or funds. Thus, Chemical argued, since it had become unable to recoup any judgment in MHT's favor by suing Ali Hazza, MHT should suffer the loss because it was MHT's mistake and subsequent delay which gave rise to the unfortunate circumstances presented. The IAS court granted MHT's motion, holding, on the stipulated facts, that it had "established its entitlement to summary judgment on its claim for funds mistakenly paid." The court found that Chemical had "credited an overdrawn account, which act taken in reliance upon

the mistaken payment, ultimately resulted in a reduction of [Chemical's] loss on that account [and t]hus, far from changing its position to its detriment, [Chemical] actually benefitted from [MHT's] mistaken payment." By virtue of its grant of summary judgment on MHT's first cause of action, the court, without reaching the merits, dismissed the second and third causes of action as duplicative.

The principle that a party who pays money, under a mistake of fact, to one who is not entitled to it should, in equity and good conscience, be permitted to recover it back is long standing and well recognized *(Ball v Shepard,* 202 NY 247, 253) and applies even if the mistake is due to the negligence of the payor *(see, e.g., Manufacturers Trust Co. v Diamond,* 17 Misc 2d 909 [App Term, 1st Dept]; *Mutual Life Ins. Co. v William B. Kessler, Inc.,* 25 Misc 2d 242, 243). The rule has its underpinnings in unjust enrichment *(see, Miller v Schloss,* 218 NY 400) and rests "upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. * * * It is an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money * * * under such circumstances that in equity and good conscience he ought not to retain it" *(supra,* at 407). Noting its equitable origins, the court in *Byxbie v Wood* (24 NY 607) stated, "Having money that rightfully belongs to another, creates a debt; and wherever a debt exists without an express promise to pay, the law implies a promise" *(supra,* at 610).

Since the doctrine is equitable in nature, it takes into account other considerations which may affect the availability of the remedy. "The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered * * *. Generally, courts will look to see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent". *(Paramount Film Distrib. Corp. v State of New York,* 30 NY2d 415, 421, *mot to amend remittitur granted* 30 NY2d 678, *cert denied* 414 US 829.) It does not matter whether the benefit is directly or indirectly conveyed. *(See, Blue Cross v Wheeler,* 93 AD2d 995.) "A person may be unjustly enriched not only where he receives money or prop-

erty, but also where he otherwise receives a benefit. He receives a benefit where his debt is satisfied or where he is saved expense or loss" *(supra,* at 996). Actions to recover money paid under mistake are frequently styled as actions for money had and received *(see, Schreibman v Chase Manhattan Bank,* 15 AD2d 769, 770; *Hoyt v Wright,* 237 App Div 124, 126), the basis of which is that the defendant has received money which, in equity and good conscience, should have been paid to or on behalf of the plaintiff and that, under such circumstances, the defendant ought to pay it over. *(Parsa v State of New York,* 64 NY2d 143, 148.)

Thus, since the essence of a mistaken payment/money had and received action is that while the plaintiff has made a mistake, the defendant will not be allowed to profit unjustly as a result, it is of no legal significance—Chemical's emphasis of the fact notwithstanding—that it was MHT's transmission error which set the chain of events in motion. MHT is entitled to recover unless, as the cases hold, Chemical can demonstrate detrimental reliance on MHT's mistaken transfer. *(See, e.g., Ferer & Sons v Chase Manhattan Bank,* 731 F2d 112, 126; *Manufacturers Trust Co. v Diamond, supra,* 17 Misc 2d, at 909-910.)* In any event, however, as we view the record, the mistake which caused MHT's loss was as much Chemical's, as it was MHT's.

While it is beyond dispute that MHT, in the transfer process, omitted a line from the first instruction it sent to Chemical, and, in retrospect, clear that such error made it impossible for Chemical to process the transfer automatically, MHT was injured, as the record demonstrates, by two separate additional acts by Chemical—crediting MHT's funds to an account for which they were never intended and which happened to be in overdraft status, and then, with knowledge of MHT's error, retaining those funds in order to limit its losses on the overdrawn account.

In this regard, MHT argues that Chemical, upon receiving a name and a nonChemical account number, one without even the proper number of digits, should have immediately called for further information or returned MHT's transfer. Instead, Chemical credited the funds to an account with a number completely at variance with the only account number it had received, an account number, in fact, with a different number of digits from the one transmitted by MHT. Chemical rejects the argument that it had an obligation to call MHT on receipt of a message containing merely the name of a Chemical

account holder, despite the fact that the only account number given, in Chemical's own words, "did not resemble a Chemical account".

Chemical explains that its operator "disregarded the eight-digit 'a/c' number which did not signify anything to Chemical * * * searched the computerized file for Chemical accounts and discovered that Chemical had an account for a firm named Ali Hazza & Co. located in Jeddah, Saudi Arabia. Concluding that the funds were to be credited to Ali Hazza * * * the operator transferred the funds to Ali Hazza's account at Chemical". It should be noted that in crediting the transfer to an account not mentioned in the message Chemical's operator ignored not only the account number given, but as well the message's meaningless termination: "KINDLY INSTR. CHEMICALB", an obvious indication that the message had been distorted in transmission. Thus, in our view, a serious question exists as to whether Chemical should have credited an obviously garbled transfer order to any account without calling MHT and requesting further instructions.*

In any event, putting aside the question of whose mistake was the privotal one in MHT's loss, consideration of the two remaining issues—whether Chemical benefited from MHT's mistake and whether under principles of equity and good conscience it should be permitted to keep MHT's money—demonstrates the lack of any valid defense to MHT's claim. For several years prior to 1983 and at all times relevant to this action, Ali Hazza's account was maintained in an over-draft basis. MHT's September 9, 1983 payment and several payments to the account on the same day reduced Ali Hazza's overdraft from approximately −$1.85 million to approximately −$1.4 million. Although the overdraft fluctuated thereafter from a high of −$3,115,063 to the sum Chemical eventually wrote off, $1,186,765.40, Ali Hazza's account was always in overdraft status. Even though the account was always in overdraft status, Chemical, in its motion papers, asserted that "[e]ffectively, the $223,000 deposit was withdrawn and used by Ali Hazza just as if the account balance was positive, reduced to zero or below, and then replenished from day to day." Similarly, it now argues that "[a]lthough Ali Hazza's account was in an overdraft status, the continuous

---

* Although there are rules governing payments transacted through the CHIPS system, the parties have chosen to litigate this matter on common-law principles.

depositing and withdrawing of money differentiates the Ali Hazza account from a situation * * * where an erroneous payment was used to pay an outstanding debt to the bank, such as a promissory note." It also asserts, "that this tremendously active account was continuously operated in an overdraft status is not material since Ali Hazza was not insolvent at any time in 1983 * * * and as a matter of course replenished debits as they were made;" and that "[i]n September 1983, Ali Hazza effectively had a revolving credit line or a loan which fluctuated at around $1.5 million and a 'zero-balance' checking account, that is, one in which funds were deposited each day to cover checks presented for payment that day."

These characterizations notwithstanding, what Ali Hazza had at all relevant times was a checking account with an overdraft line, maintained in continuous overdraft status for some seven years. And, as the record clearly establishes, MHT's mistaken transfer never left Chemical's hands and merely reduced the amount of the final negative balance. No amount of rhetorical flourish can alter this inescapable fact.

Chemical also renews its argument that the one-year delay, during which MHT was seeking a reversal of the second September 9, 1983 transfer of funds, provides it with an equitable defense to MHT's mistaken payment cause of action. This argument appears to be without factual support since it is not at all clear that the delay was MHT's fault. Moreover, it is irrelevant as a matter of law. As already noted, although MHT made a mistake in its first September 9, 1983 transfer attempt, omitting the name of the direct beneficiary, Merrill Lynch, and the latter's nine-digit Chemical account number, and sending only the name of the ultimate beneficiary and its eight-digit Merrill Lynch account number, Chemical unilaterally decided to credit MHT's payment to Ali Hazza's overdrawn Chemical account, for which it was never intended, and the number of which does not appear in any transfer order. MHT, which had no knowledge of the existence of the Ali Hazza account or of Chemical's decision to credit it with the transferred funds, identified both payments to Chemical on November 28, 1983, only a few days after it first learned from its Saudi correspondent that the latter had been debited twice. Since MHT had no way of knowing that Chemical had misdirected the first transfer, it, not unreasonably, assumed that Merrill Lynch's account somehow had been credited twice, and requested a return of the second transfer. On November

30, 1983, two days after MHT's first repayment request, Chemical reported to Merrill Lynch, the intended beneficiary, "OUR CREDIT OF 9/9/83 USD $223,280.74 RECEIVED FROM MANU- FACTURERS HANOVER TRUST CO. N.Y. * * * IS A DUPLICATION OF MANUFACTURERS PAYMENT DD SAME DAY CREDITED DIRECTLY TO BENE," and requested debit authority to reverse the credit of Merrill Lynch.

Therefore, as this record clearly discloses, within two days of MHT's request for repayment, Chemical, identifying both transfers, was able explicitly to inform Merrill Lynch that the second transfer was a duplicate of the one Chemical had credited directly to Ali Hazza. Chemical's reply to MHT, however, the party which should have been so advised, was of a different nature. By telex dated January 3, 1984, Chemical responded as follows: "RE YOUR DUPLICATE CHIPS DTD 9/9/83 USD 223,280.74 F/O MERRILL LYNCH FUTURES INC STOP PLEASE BE ADVISED MERRILL LYNCH FUTURES IS UNABLE TO OBTAIN DEBIT AUTHORIZATION FROM THEIR CUSTOMER STOP THEREFORE WE CANNOT RETURN FUNDS TO YOU STOP PLEASE CONTACT ULTIMATE BENEFICIARY DIRECTLY STOP THANK YOU."

Thus, Chemical did not provide MHT with the information it had previously furnished Merrill Lynch—that Chemical had directly credited the first transfer to Ali Hazza's account—so that MHT could have made an immediate request for return of the first transfer with an indemnity offer of the same type it had made regarding the second transfer. Instead, Chemical responded to MHT as if both payments had gone to Merrill Lynch and had been transferred, by Merrill Lynch, to Ali Hazza. Thus, MHT, on the basis of such advice, believed the recipient of both transfers to have been Merrill Lynch and accepted Chemical's response that Merrill Lynch denied debit authority. Had MHT known that Chemical credited the first transfer to Ali Hazza's Chemical account, it could have tendered its indemnity on that transfer, requiring Chemical, not MHT, to seek debit authority from Ali Hazza, Chemical's customer and transferee. Thus, at least part of the reason for the approximate 10-month delay in Ali Hazza's wiring to Chemical of debit authority in favor of MHT was Chemical's failure to inform MHT that it had miscredited the first transfer.

Even, however, had the interval between MHT's requests for return of the second transfer and the first been solely MHT's fault, that delay did not prejudice Chemical. To assert a valid defense to MHT's mistaken payment/money had and

received cause of action, Chemical must demonstrate detrimental reliance on the subject payment. *(See, e.g., Ferer & Sons v Chase Manhattan Bank, supra,* 731 F2d, at 126; *Bank Saderat Iran v Amin Beydoun, Inc.,* 555 F Supp 770, 774; *Mutual Life Ins. Co. v William B. Kessler, Inc., supra,* 25 Misc 2d, at 243.) The record, however, establishes that Chemical neither relied on MHT's transfer in any way nor suffered any detriment as a result of the transfer, since MHT's funds never left Chemical's possession. Indeed, Chemical actually benefited from the transfer because MHT's funds reduced the extent of the overdraft and of the subsequent write-off. That Ali Hazza suffered a financial decline and eventually became unable to repay the balance on its overdraft line is unrelated to MHT's transfer of funds and affords no legally cognizable defense to MHT's claim.

With regard to reliance, Chemical's vice-president states in his affidavit, "As a result of the credit of the erroneous transfer from MHT and the credit of approximately several hundred thousand dollars in separate deposits and other transfers, the negative balance in Ali Hazza's account changed from −$1,871,425.96 on September 8, 1983 to −$1,404,010.80 at the end of the day of erroneous transfer, September 9, 1983. There was nothing extraordinary about the deposit of so much money and the continuation of the overdraft status in this particular account." As he describes subsequent developments in the account, Ali Hazza's overdraft soon climbed to more than −$3,115,000. Chemical, however, does not even claim that, in permitting the overdraft to increase, it relied on MHT's transfer. Of course, any suggestion that Chemical relied on a $225,000 transfer in allowing Ali Hazza to increase its overdraft by an additional $1.5 million would hardly be taken seriously.

As justification for Chemical's ultimate refusal to return MHT's funds, Chemical's representative states: "It seems quite clear to me that had MHT asked for the incorrect payment to be reversed and [had] Ali Hazza * * * authorized a debit in late 1983, Chemical would have returned the $223,000 since at that time, Ali Hazza appeared to have the wherewithal to make good this debit and it was still in good standing". Thus, that Chemical might have been willing to return MHT's funds in November of 1983, but not in October of 1984, was not due to anything Chemical did during that period in reliance on MHT's transfer, but, rather, to Chemical's changed perception of Ali Hazza's financial status. There is no claim of payment

to Ali Hazza based on the transfer, or advance of credit to Ali Hazza based on MHT's transfer, or forbearance from demanding that Ali Hazza reduce its overdraft as a result of the transfer to justify the change of heart. This is, of course, completely consistent with Chemical's deposition testimony to the effect that it was a "credit decision" by Chemical's Middle East management not to repay MHT.

It should also be noted that it cannot even be said that Chemical's actual position vis-à-vis Ali Hazza changed adversely between November 1983 and October 1984. In fact, the contrary is the fact. On November 28, 1983, the day on which MHT requested return of the first transfer, Ali Hazza's overdraft stood at −$2,534,009; but on October 19, 1984, the day after Chemical received Ali Hazza's debit authority and several days before Chemical notified Ali Hazza and MHT that Chemical refused to act on it, Ali Hazza's overdraft stood at −$1,373,100.06. Thus, in October 1984, when Chemical refused to honor Ali Hazza's debit authority for return of the first transfer, Chemical's position with respect to Ali Hazza was approximately $1.2 million better than it had been on that day in November 1983 when MHT first requested return of its money. Chemical not only did not rely on MHT's transfer, or suffer any detriment as a consequence of the delay, but actually improved its position to a substantial extent during that period. Thus, it is clear that Chemical's refusal to return MHT's funds was based on Ali Hazza's financial failure, a development totally unrelated to MHT's mistaken transfer, and Chemical's realization that Ali Hazza was unable to repay its long-standing overdraft.

Since all the cases cited by Chemical in support of its equitable defense are premised on the proposition that the funds in question left the recipient's hands, they are not only inapposite, but, in fact, undercut Chemical's position. In *Matter of Harned* (149 Misc 476), the court held that all undistributed funds remaining in the respondent administrator's possession, as MHT's funds remained in Chemical's hands, had to be returned. In *Ball v Shepard* (202 NY 247, 254, *supra),* the court explicitly noted, "If circumstances do exist taking such a case out of the general rule permitting a recovery, the burden of proving them rests upon the party resisting the re-payment." Chemical has certainly not met its burden here. In *Mutual Life Ins. Co. v William B. Kessler, Inc. (supra,* 25 Misc 2d, at 242-243), the court found that not only had the defendant not suffered a detrimental change of position, but, like

Chemical here, had received a benefit from the mistaken payment, and that it could reverse the mistake merely by changing its records, as can Chemical here, never having let MHT's funds out of its hands. In *Nusbaum v Rialto Sec. Corp.* (238 App Div 257), the court found for defendant because the defendant had returned the funds to the person from whom it had received them. That is hardly the case here.

Nor does *Bank Saderat Iran v Amin Beydoun, Inc.* (55 F Supp 700, *supra)* bolster Chemical's position. In that case, on the basis of a finding that a mistaken payment had been made and that the defendant had shipped merchandise in reliance thereon, the court held (at 774) that the defendant had detrimentally changed his position, distinguishing the case from those "in which it has been held that, because the defendant has simply spent the money and presumably has the value of whatever he obtained by the expenditure, no detrimental change in position can be established."

The other cases cited by Chemical, *Bank of New York v Simmons & Co.* (117 Misc 103, 104-105 [App Term, 1st Dept]), *Continental Natl. Bank v Tradesmen's Natl. Bank* (173 NY 272, 283-284) and *Manufacturers Hanover Trust Co. v Akpan* (91 Misc 2d 622, 624-625), all similarly stand for the proposition that, where funds have left the defendant's control through no fault of his own, and he has consequently changed position to his detriment, defendant is not liable. These cases are not relevant here, where the funds in question have always remained in Chemical's hands and have been used to reduce its losses on Ali Hazza's overdraft.

██ ██ Chemical, seeking dismissal of the entire complaint, also challenges the legal sufficiency of MHT's second (money lent) and third (conversion) causes of action, which the IAS court dismissed "as duplicative". Chemical's arguments in this regard are as meritless as those directed to the first cause of action. A cause of action for money lent need plead only that defendant owes a sum of money lent *(see, Minevitch v Puleo,* 9 AD2d 285, 288) and MHT's pleading certainly complies with this requirement. Similarly, MHT's complaint alleges a legally sufficient cause of action for conversion. It is well settled that an action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question. *(See, Melnick v Sable,* 11 AD2d 1075.) Money, specifically identifiable and segregated, can be the subject of a conversion action. *(See, Payne v White,* 101 AD2d 975; *Peters Griffin*

*Woodward v WCSC, Inc.,* 88 AD2d 883.) Here, MHT effected a wire transfer to Chemical of a specific sum, $223,280.74, to be credited to a specific account and, by doing so, created an obligation on Chemical's part either to treat the transfer in the specified manner or return the funds. Chemical did neither. Instead, it credited the transfer to an account for which it was never intended, ultimately using the transferred funds to reduce an overdraft in that account. Since the funds at issue remain in Chemical's hands and it has refused MHT's demand for their return, it may be sued by MHT in conversion. Since, however, the second and third causes of action are duplicative, we affirm their dismissal.

Accordingly, the order of the Supreme Court, New York County (Harold Tompkins, J.), entered on or about November 2, 1989, and the judgment of said court entered thereon on November 14, 1989, which, *inter alia,* granted plaintiff's motion for summary judgment on the first cause of action and dismissed the second and third causes of action as duplicative, should be affirmed, with costs and disbursements.

MURPHY, P. J., CARRO, MILONAS and SMITH, JJ., concur.

Order, Supreme Court, New York County, entered on or about November 2, 1989, and a judgment of said court entered thereon on November 14, 1989, unanimously affirmed. Respondent shall recover of appellant $250 costs and disbursements of these appeals.