In re T.R. ACQUISITION CORP., f/k/a T. Roma Acquisition Corp., d/b/a Texas Grill, formerly d/b/a Tony Roma's, A Place for Ribs, Debtor.

Hanover Direct, Inc., Plaintiff–
Appellee,

v.

T.R. Acquisition Corp., as Debtor
and Debtor–In–Possession,
Defendant,

and

Marx Realty & Improvement Co.,
Inc., Defendant–Appellant.

No. 02 CV 8487(GEL).
Bankruptcy No. 95 B 41322(PCB).
Adversary No. 99/8216A.

United States District Court,
S.D. New York.

Aug. 8, 2003.

Edward J. Schwarz, New York City, for Defendant–Appellant.

Kenneth M. Block, Melanie Finkel, Brown, Raysman, Millstein, Felder & Steiner LLP, New York City, for Plaintiff–Appellee.

### OPINION AND ORDER

LYNCH, District Judge.

This is an appeal from an order and judgment entered by the United States Bankruptcy Court in the Southern District of New York (Prudence Carter Beatty, B.J.) on September 5, 2002, denying defendant-appellant's motion for summary judgment, granting plaintiff-appellee's cross-motion for summary judgment, and directing defendant-appellant to return to plaintiff-appellee the sum of $155,538.00 in overpaid rent, as well as pre-judgment interest of nine percent per annum, in the amount of $67,759.56. For the reasons set forth below, the order of the Bankruptcy Court will be affirmed as to the amount of overpaid rent. The award of pre-judgment interest is vacated, and the issue of pre-judgment interest is remanded to the Bankruptcy Court for further proceedings. Plaintiff-appellee's request for attorneys' fees is denied.

### BACKGROUND

*Master Lease*

The above-captioned adversary proceeding concerns a disputed commercial lease for a restaurant space located at the Cross County Shopping Center in Yonkers, New

York. The lease in question ("Master Lease") was executed on April 12, 1991, by Horn & Hardart Realty Company ("H & H" or "Tenant") as tenant, and Defendant–Appellant Marx Realty and Improvement Co. ("Marx" or "Landlord") acting as agent for the landlord. Plaintiff–Appellee Hanover Direct, Inc. ("Hanover" or "Tenant") is H & H's successor-in-interest.[1] Article I of the Master Lease, entitled "Fundamental Lease Provisions," provides under Sections 1.1(h) and (i) that the fixed minimum rent per annum is $140,000, plus a percentage rent rate of seven percent. Under Article X of the Master Lease, entitled "Bankruptcy of Tenant, Defaults by Tenant and Remedies of Landlord," Section 10.5 provides that:

> In the event Tenant remains in possession of the Leased Premises after the expiration of the tenancy created hereunder, and without the execution of a new lease, Tenant, at the option of Landlord, shall be deemed to be occupying said Leased Premises as a tenant from month to month, at twice the Fixed Minimum Rent and Percentage Rent, subject to all the other conditions, provisions, and obligations of this lease insofar as the same are applicable to a month-to-month tenancy.

The term of the Master Lease was from April 12, 1991, through January 31, 1996, with an option to renew for an additional 21 years.

*Sublease*

Nine months after execution of the Master Lease, on January 6, 1992, H & H entered into a sublease ("Sublease") for the restaurant space with now-bankrupt T.R. Acquisition Corp. ("T.R."), which operated a Tony Roma's restaurant franchise. The initial term of the Sublease was four years, commencing January 6, 1992, and expiring January 30, 1996. The Sublease contained an option to renew for an additional 21 years. In order to exercise the renewal option, T.R. was required by the Sublease to give timely notice to H & H of its intent to renew, provided that it was not in default under other provisions of the Sublease.

T.R. purported to exercise the renewal option in the Sublease by letter to H & H dated March 31, 1995. H & H rejected the attempt to exercise the renewal option because it claimed that the notice was untimely and that T.R. was already in default.

*Bankruptcy and First Adversary Proceeding*

One day earlier, on March 30, 1995, T.R. had filed a petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code, thus initiating the automatic stay under Section 362 of the Bankruptcy Code. 11 U.S.C. § 362(a). On that date, T.R. also commenced an adversary proceeding against H & H (as its landlord) and Marx (as the master landlord), seeking, inter alia, a determination as to whether its intent to exercise the renewal option under the Sublease was valid ("First Adversary Proceeding"). T.R. continued to pay rent to H & H during the pendency of the First Adversary Proceeding, and H & H continued to pay rent to Marx, as the master landlord. Marx accepted those rent payments, and did not demand double rent payments or mention Section 10.5 of the Master Lease, even after the expiration of the Master Lease in January 1996.[2]

---

1. Hanover was substituted in place of H & H in the underlying adversary proceeding by Stipulation and Order dated December 3, 2001.

2. H & H did not answer the Complaint, but rather entered into a stipulation with the Debtor dated October 19, 1995, consenting to relief sought by the Debtor. (App.Ex. O.)

The Bankruptcy Court granted summary judgment in the First Adversary Proceeding in favor of Marx by Order and Judgment dated April 10, 1997. (Order and Judgment dated Apr. 10, 1997, App. Ex. S ("1997 Order").) The Bankruptcy Court held that the Subtenant was in default under the Sublease, had forfeited its right to renew the lease, and that H & H as sublandlord had no legal duty to renew the Sublease. Furthermore, the Bankruptcy Court ruled that the Master Lease had expired on January 31, 1996, the Sublease had expired on January 30, 1996, and the Subtenant became a holdover tenant after January 30, 1996. The Bankruptcy Court accordingly ordered that Marx was entitled to immediate possession of the premises.

At the April 10, 1997, hearing, Marx argued that under the Master Lease it was entitled to double rent from T.R. for each month T.R. held over its tenancy past the expiration of the Master Lease. The Bankruptcy Court rejected from the bench the argument that Marx was entitled to any payments directly from T.R., because T.R. had never signed any lease with Marx, and had paid rent only to H & H as H & H's tenant pursuant to the Sublease. (App. Ex. R at 3, 10.) The Bankruptcy Court also noted that "a mere provision [in a Master Lease] that fixes the holdover rent at twice the rent reserved ... doesn't mirror the state law at all. The state law rule is [that] you fix [holdover payments] as use and occupation based upon fair market rental." (App. Ex. R at 3–4.)[3]

*T.R. Vacates Premises and Ceases Making Rent Payments*

Following the ruling in the First Adversary Proceeding on April 10, 1997, T.R. vacated the premises by July 1, 1997 (Joint Stmt of Facts at ¶ 8, App. Ex. KK), and ceased paying rent to H & H. H & H's parent, Hanover, however, continued to pay the fixed minimum rent and other charges to Marx. Hanover claims that the rent payments to Marx were due to an internal bookkeeping error, because its bookkeeper was never directed to stop paying rent to Marx after T.R. vacated the premises and stopped paying rent to H & H. (Reply Affidavit of Lisa Green, sworn to June 24, 2002, ¶¶ 6–12, App. Ex. JJ ("Green Reply Aff.").)

*Tenant Continues to Make Rent Payments After Premises are Vacated*

Marx continued to accept the rent payments from Tenant, even after July 1997, when Marx leased the premises to a third party, Cross County Apple, LLC ("Applebee's"), owners of an Applebee's restaurant franchise.[4] Marx does not claim that it had ever demanded that Tenant continue pay rent after T.R. had vacated the premises. There is no evidence that Marx ever advised Tenant that it was continuing to receive rent from Tenant for premises that had been leased to a third party. This situation continued for nine months.

In March 1998, Hanover stopped making rent payments to Marx because, Hanover claims, it had finally discovered the bookkeeping error. The parties have stipulated that the total amount of rent Tenant paid to Marx between May 1997 and

---

**3.** T.R. unsuccessfully appealed the 1997 Order to the District Court, and then to the Court of Appeals. The appeal to the Second Circuit was withdrawn on July 1, 1997. (Def.Mem. 15.)

**4.** It thus appears that for some time Marx was collecting rent both from its new tenant, Ap-

plebee's, and from its former tenant, H & H. There is an indication in the record that Applebee's received free rent for August, September and October 1997. Letter from Edward J. Schwarz, Esq. to David Rosenberg, Esq., dated April 16, 1998, attached as App. Ex. CC.

March 1998 was $155,538. (Joint Stmt. of Facts at ¶ 15, App. Ex. KK.) On April 8, 1998, Tenant demanded by letter than Marx return the overpayments. Marx refused to return the overpayments by letter dated April 16, 1998. Marx did not claim any entitlement to double rent at that time.

*The Present Adversary Proceeding*

In March 1999, nearly a year after Marx refused to refund the overpayments, Tenant commenced the present adversary proceeding against Marx to collect the overpayments. Marx counterclaimed that under Section 10.5 of the Master Lease, Tenant owed Marx double rent for each month that T.R. held over past the expiration of the Sublease. Marx contends that each month's rent Tenant paid after T.R. had vacated the premises should be credited against the double rent that Marx was owed for each month between January 31, 1996, when the Master Lease had expired, and July 1, 1997, when T.R. vacated the premises ("Holdover Period"). This was apparently the first time Marx claimed entitlement to double rent for the Holdover Period.[5]

Marx sought summary judgment on its counterclaim to obtain double rent, interest and attorneys' fees, and Hanover cross-moved for summary judgment on its claim for return of the overpaid rent and reasonable attorneys' fees.

After a hearing on July 25, 2002, the Bankruptcy Court held that Marx had been unjustly enriched by the overpayments and was not entitled to keep them.

(App. Ex. LL at 20.) The Court found that Tenant's payments to Marx were made by mistake, and that equity required that Marx repay the money to Hanover. The Court further found that Marx had waived its right to claim that Tenant owed double rent because Marx had not demanded the double rent after T.R. vacated the space, and simply continued to collect the regular rent from Tenant without protest. (*Id.* at 19.) In addition, the Bankruptcy Court ruled that Hanover was not liable to Marx for any rent at all after the Subtenant vacated the premises in May 1997. (*Id.* at 20.) Thus, the Bankruptcy Court denied Marx's motion for summary judgment, granted Hanover's cross-motion for summary judgment, and ordered Marx to reimburse Hanover for the nine months rent Tenant had paid after T.R.'s holdover tenancy has ended, plus pre-judgment interest in the amount of 9% per annum. (Order dated September 5, 2002, App. Ex. OO.)

Marx argues on appeal that the Bankruptcy Court erred: (1) by not enforcing the double rent provision in Section 10.5 of the Master Lease; (2) by allowing the defenses of unjust enrichment and mistake; (3) by finding that Marx waived its right to enforce the double rent provisions of the Master Lease by not demanding double rent for the holdover period during that period; (4) by ordering that Marx reimburse Hanover for the rent payments Tenant made to Marx after the Subtenant had vacated the premises; and (5) by awarding Hanover 9% pre-judgment inter-

---

**5.** In other words, Marx argues that T.R. held over for 17 months, paying the fixed minimum rent under the Sublease. For those 17 months, H & H paid the fixed minimum rent under the Master Lease to Marx. Marx claims that it was actually owed double rent under Section 10.5 of the Master Lease, so that in effect it was owed 17 more months rent than it received during T.R.'s Holdover Period. Af-

ter T.R. surrendered the premises and Marx relet the premises, Marx continued to accept the fixed minimum rent payments from H & H. Since T.R. vacated in May 1997, and H & H paid nine additional months' rent, Marx claims a right not only to retain the overpayments, but also claims to an additional eight months' rent, plus other charges and interest. (Def.Mem. 6.)

est on the amount to be reimbursed. (Defendant–Appellant's Stmt. of Issues Presented on Appeal.)

## DISCUSSION

### I. Standard of Review

■ The parties disagree about the standard of review applicable to this Court's review of the Bankruptcy Court's summary judgment order. Hanover correctly states that a district court generally reviews a bankruptcy court's findings of fact under the clearly-erroneous standard, Fed. R. Bankr.Proc. 8013, and its conclusions of law *de novo*. *In re AroChem Corp.*, 176 F.3d 610, 620 (2d Cir.1999). Hanover fails to note, however, that on an appeal specifically from a bankruptcy court's summary judgment order, the standard of review is *de novo*, and the district court draws all factual inferences in favor of the non-moving party. *See Fugazy Express, Inc. v. Fugazy*, 124 B.R. 426, 430 (S.D.N.Y.1991).

By granting summary judgment, the Bankruptcy Judge found that as a matter of law, the evidence when viewed in the light most favorable to Marx, was so "one-sided" that Hanover was entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, the Bankruptcy Court did not weigh conflicting evidence; it simply found that "no evidence was presented to the Court" that would support a finding in defendant-appellant's favor, and that defendant-appellant had therefore failed to carry its burden of showing the existence of a genuine issue of material fact. Accordingly, there are no bankruptcy court findings of fact to which deference should be accorded, because "[o]n a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues of fact to be tried." *Heyman v. Commerce & Industry Insur. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975). *See also In re M. Silverman Laces, Inc.*, No. 01 Civ. 6209, 2002 WL 31412465, *3 (S.D.N.Y. Oct. 24, 2002) ("On appeal to the district court from an order of the Bankruptcy Court granting summary judgment, the standard of review is *de novo*").

### II. Double Rent Lease Provision

■ The first question is whether the Bankruptcy Court erred by declining to enforce Section 10.5 of the Master Lease, which provides that in the event the Tenant fails to vacate the premises at the conclusion of the lease, the Landlord may deem the Tenant's continued use of the premises a month-to-month tenancy at twice the fixed rent and percentage rent. In the First Adversary Proceeding, the Bankruptcy Court declined to enforce this provision against the Subtenant because, *inter alia*, the Subtenant was not party to the Master Lease, and because the Court found that the double rent provision was inconsistent with the rule that the proper payment for use and occupancy of a premises after the lease has expired was equal to fair market rent. In the current adversary proceeding, the Bankruptcy Court declined to enforce the double rent provision against the Tenant because, inter alia, the Landlord waived the right to double rent by failing to demand it either when then Holdover Period began, or when the Tenant demanded restitution of the rent it had paid after the Subtenant had vacated. Because Section 10.5 provides a remedy to the Landlord for the Tenant's breach of the lease, and because that remedy is grossly disproportionate to the actual damages caused by the breach, this Court concludes that the double rent provision is an unenforceable penalty.

Marx argues that the Bankruptcy Court applied the wrong rule in evaluating the double rent provision, because that Court failed to distinguish between (a) a holdover tenancy created when a landlord accepts rent from a non-vacating tenant at any time after a lease has expired, N.Y. Real Property Law § 232-c; [6] and (b) a situation where the landlord does not accept rent from the non-vacating tenant and elects to deem the non-vacating tenant a trespasser, N.Y. Real Property Law § 220, *Jaroslow v. Lehigh Valley Railroad Co.*, 23 N.Y.2d 991, 298 N.Y.S.2d 999, 246 N.E.2d 757 (1969). Marx argues that in the first instance, when a landlord elects to accept rent, a month-to-month holdover tenancy is created, subject to the covenants and conditions of the former lease except as the parties agree to change those terms. In the second instance, where the landlord elects to treat the non-vacating tenant as a trespasser, the landlord is entitled not to "rent" under a contract, but rather to equitable payments equaling the reasonable value of the premises for the use and occupancy of the premises during the time the trespasser is in possession.

Marx argues that it accepted rent from Tenant after the Master Lease expired, thus creating a month-to-month holdover tenancy subject to all the provisions of the Master Lease, including Section 10.5 requiring that the holdover tenant pay double rent. Marx argues that the Bankruptcy Court should have enforced this contractual provision, but instead erred by holding that Hanover should be required to pay only what a trespasser would be required to pay, that is, fair market value for use and occupancy.

While it is not entirely clear from the transcripts of the 1997 and 2002 Hearings whether the Bankruptcy Judge engaged in precisely this logic, this Court agrees with Marx that by accepting rent from Tenant after the expiration of the Master Lease, a month-to-month holdover tenancy was created that is governed by the terms of the Master Lease as well as Section 232-c of the New York Real Property Law. Principles of contract apply to an interpretation of the Master Lease.

Section 10.5 is in the portion of the lease entitled "Bankruptcy of Tenant, Defaults by Tenant and Remedies of Landlord." It is clearly intended by the parties to be a remedy for breach of contract occasioned by a tenant's failure to vacate when the Master Lease expires. Marx's attempt to characterize this provision as a duly negotiated rent for a holdover period is unconvincing. While Section 10.5 is entitled "Holdover By Tenant," by its terms it is actually applicable to any non-vacating tenant, not only holdover tenants as defined by law. As Marx repeatedly emphasizes, a holdover tenancy may be created at the landlord's election when a landlord accepts rent from a non-vacating tenant any time after the conclusion of a lease. Section 10.5, however, provides the landlord the option of creating a holdover tenancy *even when no rent is tendered* by the non-vacating tenant. Under N.Y. Real Property Law § 232-c, the landlord may

---

**6.** Section 232-c provides that:

Where a tenant whose term is longer than one month holds over after the expiration of such term, such holding over shall not give to the landlord the option to hold the tenant for a new term solely by virtue of the tenant's holding over. In the case of such a holding over by the tenant, the landlord may proceed, in any manner permitted by law, to remove the tenant, or, if the landlord shall accept rent for any period subsequent to the expiration of such term, then, unless an agreement either express or implied is made providing otherwise, the tenancy created by the acceptance of such rent shall be a tenancy from month to month commencing on the first day after the expiration of such term.

elect either to create a holdover tenancy or to treat the non-vacating tenant as a trespasser, only if the tenant tenders rent. *See Jaroslow*, 23 N.Y.2d at 991, 298 N.Y.S.2d 999, 246 N.E.2d 757. The plain language of Section 10.5 immediately subjects a non-vacating tenant to the double rent provision, even absent a tender of rent. It thus applies to any situation where a tenant fails to vacate. As such, it is inconsistent with the law of holdover tenancies that Marx purports to rely on.

For these reasons, the Court concludes that Section 10.5 is a damages provision that applies to any tenant who breaches the lease by failing to vacate the premises upon expiration of the lease. While Section 10.5 is not explicitly identified as a liquidated damages provision, that is its function in the lease. *See Truck Rent–A–Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (1977). ("[i]n effect, a liquidated damage provision is an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement.")

 It is well established that "[p]arties to a contract have the right to agree to [liquidated damages] clauses, provided that the clause is neither unconscionable nor contrary to public policy." *Truck Rent–A–Center*, 41 N.Y.2d at 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015, *citing Mosler Safe Co. v. Maiden Lane Safe Deposit Co.*, 199 N.Y. 479, 485, 93 N.E. 81 (1910). A damages clause is deemed contrary to public policy when its purpose is not to compensate the injured party for breach, but is rather to impose a penalty on the breaching party by requiring payment of a sum of money "grossly disproportionate to the amount of actual damages." *Truck Rent–A–Center*, 41 N.Y.2d at 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015; *Pyramid Centres and Co. v.*

*Kinney Shoe Corp.*, 244 A.D.2d 625, 663 N.Y.S.2d 711, 713 (3d Dep't 1997). In such a case, the damages provision "is not intended to provide fair compensation but to secure performance by the compulsion of the very disproportion." *Truck Rent–A–Center*, 41 N.Y.2d at 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015.

 The question presented, therefore, is whether the provision calling for double rent in the event of a failure to vacate is an enforceable damages clause or an unenforceable penalty. Where there is no evidence of a gross deviation from actual damages, courts will enforce a liquidated damages clause calling for double or even treble rent when a tenant fails to timely vacate premises. *See Federal Realty L.P. v. Choices Women's Med. Ctr.*, 289 A.D.2d 439, 735 N.Y.S.2d 159 (2d Dep't 2001) (granting summary judgment enforcing treble-rent liquidated damages provision against non-vacating tenant, absent evidence that sum was grossly disproportionate to actual damages). However, where there is evidence of gross disproportion, a damages clause will not be enforced. *See Square Lex 48 Corp. v. Shelton Towers Assoc.*, 98 Misc.2d 1039, 415 N.Y.S.2d 325 (Sup.Ct.N.Y.Co.1978) (holding liquidated damages lease provision unenforceable against non-vacating tenant when the evidence showed that the liquidated damages were far greater than actual damages).

In this case, the record evidence conclusively establishes that the actual damages caused by Tenant's failure to timely vacate the premises were not in proportion to the liquidated damage amount. Under the Master Lease, the fixed minimum rent was set at $140,000 per annum, with a percentage rent of 7%. Hanover has presented undisputed evidence that after the Subtenant vacated the premises as of July 1, 1997, Marx relet the premises to another restaurant business for a rent of $130,000

per annum starting July 1, 1997. (Letter from Edward J. Schwarz to Zane Tankel, dated June 30, 1997; Lease between Marx and Applebee's attached as App. Ex. AA.) The double rent of $280,000 per annum (not even counting the double percentage rent) that Marx demands of Hanover pursuant to Section 10.5 is clearly far in excess of a fair market rent for the premises, and thus far in excess of any damage Marx may have sustained as result of the breach.

Because it is possible to gauge the actual damages the Landlord sustained occasioned by the Tenant's breach in holding over, and because the inescapable conclusion is that the double rent called for by Section 10.5 is grossly disproportionate to the actual damages, that provision is deemed a penalty for failure to vacate the premises and will not be enforced. Because Section 10.5 is unenforceable, the amount that the Tenant owed the Landlord during the course of the Holdover Period is what Tenant actually paid and what Marx accepted without protest. Accordingly, Tenant is not liable to Marx for any additional payments for the Holdover Period.[7]

## III. *Mistake and Unjust Enrichment*

■ The next question is whether the Bankruptcy Court erred in ordering Marx to repay Hanover the rent payments it made to Marx after the Subtenant had vacated the property. Because Hanover has demonstrated that the continuing rent payments were made as a result of a mistake of fact, the Court finds that Marx was unjustly enriched by the post-surrender rent payments and is required to repay them.

■ When a party seeks recovery of rent paid to a landlord who had no legal entitlement to it, courts apply the doctrines of mistake and unjust enrichment to determine whether the tenant should recover the overpaid amounts. In this case, the premises were surrendered to the Landlord when the Subtenant vacated and the Landlord relet the premises to a third party. *See NHS National Health Services, Inc. v. Kaufman,* 250 A.D.2d 528, 673 N.Y.S.2d 129 (1st Dep't 1998), *citing Riverside Research Inst. v. KMGA, Inc.,* 68 N.Y.2d 689, 506 N.Y.S.2d 302, 497 N.E.2d 669 (1986) (noting that a plaintiff vacating and a landlord reletting a premises establishes surrender of the premises as a matter of law). Since the Master Lease had expired on January 31, 1996, the Tenant had no obligation to pay rent to the Landlord once the premises had been surrendered. Because, as determined above, the Landlord had no right to double rent payments for the Holdover period, the Court rejects the Landlord's rationale that it was entitled to keep the post-surrender rent accepted from the Tenant as back payments to cover double rent. In sum, the Landlord had no legal claim to the rent payments made by the Tenant after the Subtenant had vacated the premises.

Hanover argues that rent payments were made to Marx after the Subtenant had vacated the premises because of failures of communication between different departments within Hanover itself. Hanover states that it eliminated its restaurant operations department in the early 1990s and assigned the remaining restaurant leases, including the leases entered into by its subsidiary H & H, to its corporate finance department. That department assigned a bookkeeper named Regina Robin-

---

7. Because the double-rent provision of the Master Lease is an unenforceable penalty, it is not necessary to consider Tenant's alternative argument that Marx waived its right to collect double rent. Because Marx has no right to double rent, there was no right to waive.

son the task of preparing and remitting rent checks. Hanover claims that Robinson was inadvertently not informed that she should cease sending rent checks to Marx after the Subtenant vacated. (Green Reply Aff. at ¶¶ 4–7, App. Ex. JJ.) Robinson therefore continued to prepare and send rent checks to Marx. If this is what happened, then the overpayments were made under a mistake of fact, and Hanover would be entitled to repayment even if it was negligent in making them. *See NHS*, 673 N.Y.S.2d at 129 (holding that where tenant inadvertently continued paying rent for vacated commercial space after expiration of lease, former tenant is entitled to recovery, even if overpayments resulted from former tenant's negligence); *Bank of New York v. Spiro*, 267 A.D.2d 339, 700 N.Y.S.2d 207 (2d Dep't 1999) ("[m]oney paid under a mistake of fact may be recovered, even if the mistake was the result of the payor's negligence, unless the payee has detrimentally relied on the payment").

 Marx argues that Hanover failed to present evidence that its continued payment of rent after the Holdover Period was a mistake of fact. If Hanover made the payments with the intent of paying double rent pursuant to Section 10.5, in the mistaken belief that the double-rent provision applied, it would probably not be entitled to reimbursement. The traditional rule, somewhat ameliorated but still apparently applicable,[8] is that a voluntary payment made with full knowledge of the facts cannot be recovered because it is made pursuant to a mistake of law. *See Gimbel Bros., Inc. v. Brook Shopping Centers, Inc.*, 118 A.D.2d 532, 499 N.Y.S.2d 435, 439 (2d Dep't 1986) (holding that where a

shopping mall tenant "voluntarily [and] without protest" made Sunday rent payments that were not required by the lease "as a matter of convenience, without having made any effort to learn what its legal obligations were," it was not entitled to reimbursement because the mistake was one of law, not fact); *Caldor Corp. v. S Plaza Assoc. L.P. (In re Caldor, Inc.)*, 217 B.R. 121 (Bankr.S.D.N.Y.1998) (finding that when overpayments are voluntarily made as a result of a tenant's "marked lack of diligence" to determine its legal obligations under a lease, the tenant is not entitled to recovery of actual overpayments).

The question is thus whether Hanover continued to send rent payments due to clerical oversight, or whether those payments were part of a deliberate attempt to make back payments Hanover believed it owed under the Master Lease. Marx attempts to reduce the question of Hanover's intent in remitting the rent checks to the state of mind of the bookkeeper assigned the clerical task of preparing and mailing the rent payments, and argues that since Robinson has not provided an affidavit, there is no evidence of her intent when she prepared the checks to send to Marx. However, when determining the intent of a large corporation in making routine payments, it is a caricature of the personal knowledge requirement of Fed. R. Civ. Proc. 56(e) and Fed. R. Bankr.Proc. 7056(e) to focus the inquiry on the state of mind of the individual who physically cuts the check. The management decision, or lack of decision, must occur at a higher level. *See United States v. Siemens Corp.*, 621 F.2d 499, 508 (2d Cir.1980) (noting in a

---

8. CPLR 3005 modifies the common law rule by providing that "relief shall not be denied merely because the mistake is one of law rather than one of fact." The New York Court of Appeals has held, however, that this does not require relief to be granted in all cases where there is mistake of law. *See Mercury Mach. Importing Corp. v. City of New York*, 3 N.Y.2d 418, 429, 165 N.Y.S.2d 517, 144 N.E.2d 400 (1957).

different context that "opinions of lower level· employees without management responsibility, absent some indication that the senior management has seriously considered and endorsed those views, simply do not constitute evidence of a corporate intent or commitment").

Hanover submitted in this regard two affidavits from Hanover's in-house counsel (Affidavit of Lisa Green, sworn to May 1, 2002, App. Ex. FF, and Green Reply Aff., App. Ex. JJ); and Hanover's letter to Marx informing them that an overpayment error had been discovered (Letter from David Rosenberg to Edward J. Schwarz dated April 8, 1998, App. Ex. BB.) Marx argues that the affidavits of Hanover's in-house counsel are mere hearsay, and do not constitute evidence of Hanover's intent in sending rent payments past the Holdover Period. But that argument is based on a mistaken assumption of what Hanover must prove. Hanover is required to establish the intent of the corporate entity, not that of the bookkeeper. To further complicate the analysis, Hanover is faced with the task of proving a negative, i.e. demonstrating that the company did not have the intent to make back payments on double rent when it sent post-Holdover rent checks to Marx. Hanover's affidavits recount the reassignment of rent check payments based on documents from Hanover's files, and state that the bookkeeper was never informed she should stop sending checks to Marx for the premises at issue, and that the continued payments were involuntary and a mistake. (Green Reply Aff. at ¶¶ 4–6, 9, 11, 12, App. Ex. JJ.)

In-house counsel are competent to testify as to policies and procedures in place at their company, so Green's testimony as to the reassignment of rent payment duties is admissible. Green is also in a position to testify as to Hanover's management decision (or lack thereof) to continue paying rent on premises that its subtenant had vacated. Since Hanover's in-house counsel, on personal knowledge and after a review of the files, testifies that Hanover never had the corporate intent to make such payments pursuant to Section 10.5, Hanover has produced evidence that there was no intent to make back payments pursuant to Section 10.5, and that the payments were thus inadvertent.

Hanover's position also accords with common sense. If Hanover had believed that it was obligated to pay double rent during the Holdover Period, it is logical to assume that it would have paid double rent each month, rather than pay the lease amount only, and then continue to pay the lease amount after the premises had been surrendered for a period of time equal to the Holdover Period. Alternatively, if it had wanted to defer some portion of double rent it believed it owed, Hanover presumably would have attempted to negotiate such an arrangement with Marx. There is no evidence of any such discussion on the part of either party to the lease.

Marx presents no evidence to cast doubt on Hanover's assertions. After conclusion of discovery, Marx can present no evidence that anyone in management authority at Hanover ever considered even the possibility of double rent under the Master Lease at the time the post-Holdover rent payments were remitted. Nor, so far as the record shows, did Marx ever advise Hanover during the Holdover Period that it considered itself entitled to additional rent, and was accepting the rent payments only on account. Marx offers only the speculation that the post-Holdover payments were made as the result of a business decision at Hanover. Because there is no evidence to support this speculation, and no logical reason to infer that hanover believed it was required to pay double rent or was in fact repaying double rent that was owing

but had not been paid, Marx has not raised a contested issue of fact concerning Hanover's intent to continue making rent payments after the Subtenant's surrender of the premises. Thus, the Bankruptcy Court correctly found that there is no genuine dispute as to Hanover's mistake of fact in continuing to make rent payments after the Holdover Period had ended.

■ Under the principle of unjust enrichment, a party may not retain payments mistakenly made by another, to which it is not entitled. *Manufacturers Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113, 559 N.Y.S.2d 704, 707 (1st Dep't 1990) (nothing that the "principle that a party who pays money, under a mistake of fact, to one who is not entitled to it should, in equity and good conscience, be permitted to recover it back is longstanding and well recognized" (internal citations omitted)). The Bankruptcy Court relied on this principle in ordering Marx to repay Hanover the post-Holdover rent mistakenly paid to Marx. Marx argues that the Bankruptcy Court erred in applying the doctrine here because unjust enrichment does not apply to a transaction governed by an express contract between the parties. (Def.Mem. 25.)

Unjust enrichment is properly applied here because the post-Holdover payments were made as the result of a mistake of fact, and because there was no contract governing those payments. The Master Lease had expired as of January 31, 1996, before the post-Holdover Period began. The only provision of the Master Lease which could have conceivably applied to the post-Holdover payments, Section 10.5, has been ruled an unenforceable penalty. Therefore, the Bankruptcy Court's order that Marx repay Hanover the post-Holdover rent payments on the grounds of mistake and unjust enrichment is affirmed.

## IV. *Interest*

The Bankruptcy Court awarded plaintiff-appellant pre-judgment interest in the amount of $67,759.56. (September 5, 2002 Order, App. Ex. OO.) Marx makes various arguments that pre-judgment interest should not be awarded at all, or should have been calculated at a different rate. (Def.Mem. 36–41.) It appears, however, that these arguments were never considered by the Bankruptcy Court, because the 2002 Order was apparently signed before that Court received Marx's submissions on this issue. (Def. Aff. in Opp. to Pl. Presentment of Order and Judgment sworn to Sept. 11, 2002.) Rather than address these issues for the first time on appeal, the question of pre-judgment interest is remanded to the Bankruptcy Court for further review.

## V. *Attorneys' Fees*

■ Hanover requests that the Court award it reasonable attorneys' fees incurred in the proceeding below, as well as in connection with this appeal. (P. Mem. 25.) As authority for this request, Hanover cites only Section 12.37 of the Master Lease, which provides that "in the event that Tenant is successful in litigation against Landlord, Landlord shall be liable for an award of attorneys' fees." Hanover does not refer to any prior request that the Bankruptcy Court award attorneys' fees based on this lease provision, and indeed the proposed judgment that it submitted, which was subsequently accepted by the Court, does not include such an award. (App.Ex. MM.) While a court of appeals retains discretion to decide questions not initially raised in proceedings below, *see In re Hilsen*, 119 B.R. 435, 439 (S.D.N.Y.1990), the general rule is that an appellate court will not consider an issue not passed upon below unless failure to entertain the issue will result in a manifest

injustice. *See In re Lionel Corp.,* 29 F.3d 88, 92 (2d Cir.1994). Here, there is no such danger.

As to fees in connection with this appeal, Bankruptcy Rule 8020 provides that a district court may award just damages and single or double costs to an appellee if the district court determines that appeal from a bankruptcy court order is frivolous. The Court declines to award attorneys' fees under that Rule. First, such a request for fees should be presented in a separately filed motion, and here, Hanover merely asks for fees in a cursory paragraph at the end of its brief. *See AT & T Universal Card Services Corp. v. Williams (In re Williams),* 224 B.R. 523 (2d Cir. BAP 1998). Second, Marx's appeal was not frivolous, so that the Court would deny a motion for attorneys' fees under Bankruptcy Rule 8020 even if properly made.

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's order directing defendant-appellant to repay plaintiff-appellee $155,538.00 in mistakenly overpaid rent is affirmed. The Bankruptcy Court's award of $67,759.56 in pre-judgment interest is vacated and the issue of pre-judgment interest is remanded to the Bankruptcy Court for further proceedings. Plaintiff-appellee's request for an award of attorneys' fees is denied.

SO ORDERED.